BROWN, J.
I respectfully dissent.
I
In 1942, the United States Supreme Court, like a wizard trained at Hogwarts, waved its wand and “plucked the commercial doctrine out of thin *978 air.” (Kozinski & Banner, Who’s Afraid of Commercial Speech (1990) 76 Va. L.Rev. 627, 627.) Unfortunately, the court’s doctrinal wizardry has created considerable confusion over the past 60 years as it has struggled to define the difference between commercial and noncommercial speech. The United States Supreme Court has, in recent years, acknowledged “the difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category.” (City of Cincinnati v. Discovery Network, Inc. (1993) 507 U.S. 410, 419 [113 S.Ct. 1505, 1511, 123 L.Ed.2d 99] (Discovery Network).) After tracing the various definitions of commercial speech used over the years, the court conceded that no “categorical definition of the difference between” commercial and noncommercial speech exists. {Id. at pp. 420-423 [113 S.Ct. at pp. 1511-1513].) Instead, the difference is a matter of “ ‘common[]sense’ ” (Ohralik v. Ohio State Bar Assn. (1978) 436 U.S. 447, 455-456 [98 S.Ct. 1912, 1918-1919, 56 L.Ed.2d 444] (Ohralik)), and restrictions on speech “must be examined carefully to ensure that speech deserving of greater constitutional protection is not inadvertently suppressed.” (Bolger v. Youngs Drug Products Corp. (1983) 463 U.S. 60, 66 [103 S.Ct. 2875, 2879-2880, 77 L.Ed.2d 469], fn. omitted (Bolger).) Consistent with these pronouncements, the United States Supreme Court has expressly refused to define the elements of commercial speech. (See id. at p. 67, fn. 14 [103 S.Ct. at pp. 2880-2881].) Indeed, “the impossibility of specifying the parameters that define the category of commercial speech has haunted its jurisprudence and scholarship.” (Post, The Constitutional Status of Commercial Speech (2000) 48 UCLA L.Rev. 1, 7.)
Despite this chaos, the majority, ostensibly guided by Bolger, has apparently divined a new and simpler test for commercial speech. Under this “limited-purpose test,” “categorizing a particular statement as commercial or noncommercial speech requires consideration of three elements: the speaker, the intended audience, and the content of the message.” (Maj. opn., ante, at p. 960.) Unfortunately, the majority has forgotten the teachings of H.L. Mencken: “every human problem” has a “solution” that is “neat, plausible, and wrong.” (Mencken, Prejudices: Second Series (1977 reprint) p. 148.) Like the purported discovery of cold fusion over a decade ago, the majority’s test for commercial speech promises much, but solves nothing. Instead of clarifying the commercial speech doctrine, the test violates fundamental principles of First Amendment jurisprudence by making the level of protection given speech dependent on the identity of the speaker—and not just the speech’s content—and by stifling the ability of certain speakers to participate in the public debate. In doing so, the majority unconstitutionally favors some speakers over others and conflicts with the decisions of other courts.
Contrary to the majority’s belief, our current First Amendment jurisprudence defies any simple solution. Under the commercial speech doctrine *979 currently propounded by the United States Supreme Court, all speech is either commercial or noncommercial, and commercial speech receives less protection than noncommercial speech. (Central Hudson Gas & Elec. Corp. v. Public Serv. Comm’n (1980) 447 U.S. 557, 562-563 [100 S.Ct. 2343, 2349-2350, 65 L.Ed.2d 341] (Central Hudson).) The doctrine further assumes that all commercial speech is the same under the First Amendment. Thus, all commercial speech receives the same level of lesser protection. The state may therefore ban all commercial speech “that is fraudulent or deceptive without further justification” (Edenfield v. Fane (1993) 507 U.S. 761, 768 [113 S.Ct. 1792, 1798-1799, 123 L.Ed.2d 543]), but may not do the same to fraudulent or deceptive speech in “ ‘matters of public concern’ ” (Dun & Bradstreet, Inc. v. Greenmoss Builders (1985) 472 U.S. 749, 758-759 [105 S.Ct. 2939, 2944-2945, 86 L.Ed.2d 593] (plur. opn. of Powell, J.) (Dun & Bradstreet), quoting First National Bank of Boston v. Bellotti (1978) 435 U.S. 765, 776 [98 S.Ct. 1407, 1415-1416, 55 L.Ed.2d 707] (Bellotti)).
This simple categorization presupposes that commercial speech is wholly distinct from noncommercial speech and that all commercial speech has the same value under the First Amendment. The reality, however, is quite different. With the growth of commercialism, the politicization of commercial interests, and the increasing sophistication of commercial advertising over the past century, the gap between commercial and noncommercial speech is rapidly shrinking. As several commentators have observed, examples of the intersection between commercial speech and various forms of noncommercial speech, including scientific, political and religious speech, abound. (See, e.g., Kozinski & Banner, Who’s Afraid of Commercial Speech, supra, 76 Va. L.Rev. at pp. 639-648; Redish, Product Health Claims and the First Amendment: Scientific Expression and the Twilight Zone of Commercial Speech (1990) 43 Vand. L.Rev. 1433, 1449-1454.) Indeed, the recent commissioning of a Fay Weldon novel by the jewelry company Bulgari as a marketing ploy highlights this blurring of commercial and noncommercial speech. (See Arnold, Making Books: Placed Products, and Their Cost, N.Y. Times (Sept. 13, 2001) p. E3, col. 1.)
Although the world has become increasingly commercial, the dichotomous nature of the commercial speech doctrine remains unchanged. The classification of speech as commercial or noncommercial determines the level of protection accorded to that speech under the First Amendment. Thus, the majority correctly characterizes the issue as “whether defendant corporation’s false statements are commercial or noncommercial speech for purposes of constitutional free speech analysis under the state and federal Constitutions.” (Maj. opn., ante, at p. 946.) If Nike’s press releases, letters *980 and other documents are commercial speech, then the application of Business and Professions Code sections 17204 and 17535[1]—which establish strict liability for false and misleading ads—is constitutional. Otherwise, it is not.
Constrained by this rigid dichotomy, I dissent because Nike’s statements are more like noncommercial speech than commercial speech. Nike’s commercial statements about its labor practices cannot be separated from its noncommercial statements about a public issue, because its labor practices are the public issue. Indeed, under the circumstances presented in this case, Nike could hardly engage in a general discussion on overseas labor exploitation and economic globalization without discussing its own labor practices. (See Thomas v. Collins (1945) 323 U.S. 516, 534-535 [65 S.Ct. 315, 324-325, 89 L.Ed. 430].) Thus, the commercial elements of Nike’s statements are “inextricably intertwined” with their noncommercial elements. (Riley v. National Federation of Blind (1988) 487 U.S. 781, 796 [108 S.Ct. 2667, 2677,101 L.Ed.2d 669] (Riley).) This court should therefore “apply [the] test for fully protected expression” (ibid.) notwithstanding the majority’s specious distinctions of the relevant case law. Under this test, a categorical ban on all false and misleading statements made by Nike about its labor practices violates the First Amendment.
Although this result follows from controlling United States Supreme Court precedent, I believe the commercial speech doctrine, in its current form, fails to account for the realities of the modem world—a world in which personal, political, and commercial arenas no longer have sharply defined boundaries. My sentiments are not unique; many judges and academics have echoed them. (See, e.g., Kozinski & Banner, The Anti-History and Pre-History of Commercial Speech (1993) 71 Tex. L.Rev. 747; Kozinski & Banner, Who’s Afraid of Commercial Speech, supra, 76 Va. L.Rev. at p. 627; Redish, The First Amendment in the Marketplace: Commercial Speech and the Values of Free Expression (1971) 39 Geo. Wash. L.Rev. 429.) Even some justices on the high court have recently questioned the validity of the distinction between commercial and noncommercial speech. (See 44 Liquormart, Inc. v. Rhode Island (1996) 517 U.S. 484, 522 [116 S.Ct. 1495, 1518, 134 L.Ed.2d 711] (conc. opn. of Thomas, J.) [“I do not see a philosophical or historical basis for asserting that ‘commercial’ speech is of Tower value’ than ‘noncommercial’ speech”]; id. at p. 517 [116 S.Ct. at p. 1515] (cone, opn. of Scalia, J.) [“I share Justice Thomas’s discomfort with the Central Hudson test”].) Nonetheless, the high court has apparently declined to abandon it. (See, e.g., Greater New Orleans Broadcasting Assn., Inc. v. Untied States (1999) 527 U.S. 173, 183 [119 S.Ct. 1923, 1929-1930, 144 *981 L.Ed.2d 161, 164 A.L.R. Fed. 711] (Greater New Orleans Broadcasting) [applying the Central Hudson test to restrictions on commercial speech].) Given that the United States Supreme Court is not prepared to start over, we must try to make the commercial speech doctrine work—warts and all. To this end, I believe the high court needs to develop a more nuanced approach that maximizes the ability of businesses to participate in the public debate while minimizing consumer fraud.
II
According to the majority, all speech containing the following three elements is commercial speech: (1) “a commercial speaker” (maj. opn., ante, at p. 963); (2) “an intended commercial audience” (ibid.); and (3) “representations of fact of a commercial nature” (ibid.). The first element is satisfied whenever the speaker is engaged in “the production, distribution, or sale of goods or services” “or someone acting on behalf of a person so engaged.” (Id. at p. 960.) The second element is satisfied whenever the intended audience is “actual or potential buyers or customers of the speaker’s goods or services, or persons acting for actual or potential buyers or customers, or persons (such as reporters or reviewers) likely to repeat the message to or otherwise influence actual or potential buyers or customers.” (Ibid.) The third element is satisfied whenever “the speech consists of representations of fact about the business operations, products, or services of the speaker (or the individual or company that the speaker represents), made for the purpose of promoting sales of, or other commercial transactions in, the speaker’s products or services.” (Id. at p. 961.)
Although the majority constructed this limited-purpose test from its “close reading of the high court’s commercial speech decisions” (maj. opn., ante, at p. 960), it conveniently dismisses those decisions that cast doubt on its formulation. As explained below, a closer review of the relevant case law reveals that the majority’s test for commercial speech contravenes longstanding principles of First Amendment law.
First, the test flouts the very essence of the distinction between commercial and noncommercial speech identified by the United States Supreme Court. “If commercial speech is to be distinguished, it ‘must be distinguished by its content.’ ” (Bates v. State Bar of Arizona (1977) 433 U.S. 350, 363 [97 S.Ct. 2691, 2699, 53 L.Ed.2d 810], italics added (Bates), quoting Va. Pharmacy Bd. v. Va. Consumer Council (1976) 425 U.S. 748, 761 [96 S.Ct. 1817, 1825, 48 L.Ed.2d 346] (Va. Consumer Council).) Despite this caveat, the majority distinguishes commercial from noncommercial speech using two criteria wholly unrelated to the speech’s content: the identity of the *982 speaker and the intended audience. (See maj. opn., ante, at p. 960.) In doing so, the majority strays from the guiding principles espoused by the United States Supreme Court.
Second, the test contravenes a fundamental tenet of First Amendment jurisprudence by making the identity of the speaker potentially dispositive. As the United States Supreme Court stated long ago, “[the] identity of the speaker is not decisive in determining whether speech is protected” (Pacific Gas & Elec. Co. v. Public Util. Comm’n (1986) 475 U.S. 1, 8 [106 S.Ct. 903, 907, 89 L.Ed.2d 1] (plur. opn. of Powell, J.) (Pacific Gas & Electric)), and “speech does not lose its protection because of the corporate identity of the speaker” (id. at p. 16 [106 S.Ct. at p. 912]). This is because corporations and other speakers engaged in commerce “contribute to the ‘discussion, debate, and the dissemination of information and ideas’ that the First Amendment seeks to foster.” (Id. at p. 8 [106 S.Ct. at p. 907], quoting Bellotti, supra, 435 U.S. at p. 783 [98 S.Ct. at p. 1419].) Thus, “[t]he inherent worth of the speech in terms of its capacity for informing the public does not depend upon the identity of its source, whether corporation, association, union, or individual.” (Bellotti, at p. 777 [98 S.Ct. at p. 1416], italics added.) Despite these admonitions, the majority has made the identity of the speaker a significant, and potentially dispositive, factor in determining the scope of protection accorded to speech under the First Amendment. (See maj. opn., ante, at p. 960.) As a result, speech by “someone engaged in commerce” may receive less protection solely because of the speaker’s identity. {Ibid.) Indeed, the majority’s limited-purpose test makes the identity of the speaker dispositive whenever the speech at issue relates to the speaker’s business operations, products, or services, in contravention of United States Supreme Court precedent. (See Pacific Gas & Electric, supra, 475 U.S. at p. 8 [106 S.Ct. at pp. 907-908] (plur. opn. of Powell, J.).)
Third, the test violates the First Amendment by stifling the ability of speakers engaged in commerce, such as corporations, to participate in debates over public issues. The United States Supreme Court has broadly defined public issues as those issues “about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.” (Thornhill v. Alabama (1940) 310 U.S. 88, 102 [60 S.Ct. 736, 744, 84 L.Ed. 1093].) “The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled . . . .” (New York Times Co. v. Sullivan (1964) 376 U.S. 254, 269 [84 S.Ct. 710, 720, 11 L.Ed.2d 686, 95 A.L.R.2d 1412] (New York Times).) “[S]peech on public issues occupies the ‘ “highest rung of the hierarchy of First Amendment values,” ’ and is entitled to special protection” (Connick v. Myers (1983) 461 U.S. 138, 145 [103 S.Ct. 1684, 1689, 75 L.Ed.2d 708]), *983 because such speech “is more than self-expression; it is the essence of self-government” (Garrison v. Louisiana (1964) 379 U.S. 64, 74-75 [85 S.Ct. 209, 216, 13 L.Ed.2d 125]). “The First and Fourteenth Amendments remove ‘governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us, in the hope that use of such freedom will ultimately produce a more capable citizenry and more perfect polity . . . .’ ” (Consolidated Edison Co. v. Public Serv. Comm’n of New York (1980) 447 U.S. 530, 534 [100 S.Ct. 2326, 2331, 65 L.Ed.2d 319] (Consolidated Edison), quoting Cohen v. California (1971) 403 U.S. 15, 24 [91 S.Ct. 1780, 1787-1788, 29 L.Ed.2d 284].) Thus, the First Amendment “both fully protects and implicitly encourages” public debate on “ ‘matters of public concern.’ ” (Pacific Gas & Electric, supra, 475 U.S. at p. 9 [106 S.Ct. at p. 908] (plur. opn. of Powell, J.), quoting Thomill v. Alabama, supra, 310 U.S. at p. 101 [60 S.Ct. at pp. 743-744].)
To ensure “uninhibited, robust, and wide-open” “debate on public issues” (New York Times, supra, 376 U.S. at p. 270 [84 S.Ct. at pp. 720-721]), the United States Supreme Court has recognized that some false or misleading speech must be tolerated. Although “[u]ntruthful speech, commercial or otherwise, has never been protected for its own sake” (Va. Consumer Council, supra, 425 U.S. at p. 771 [96 S.Ct. at p. 1830]), “[t]he First Amendment requires that we protect some falsehood in order to protect speech that matters” (Gertz v. Robert Welch, Inc. (1974) 418 U.S. 323, 341 [94 S.Ct. 2997, 3007, 41 L.Ed.2d 789] (Gertz)). The “erroneous statement is inevitable in free debate, and ... it must be protected if the freedoms of expression are to have the ‘breathing space’ that they ‘need to survive’ . . . .” (New York Times, supra, 376 U.S. at pp. 271-272 [84 S.Ct. at p. 721], quoting N.A.A.C.P. v. Button (1963) 371 U.S. 415, 433 [83 S.Ct. 328, 338, 9 L.Ed.2d 405].) Because “a rule that would impose strict liability on a” speaker “for false factual assertions” in a matter of public concern “would have an undoubted ‘chilling’ effect” on speech “that does have constitutional value” (Hustler Magazine v. Falwell (1988) 485 U.S. 46, 52 [108 S.Ct. 876, 880, 99 L.Ed.2d 41]), “only those false statements made with the high degree of awareness of their probable falsity demanded by New York Times may be the subject of either civil or criminal sanctions” (Garrison v. Louisiana, supra, 379 U.S. at p. 74 [85 S.Ct. at p. 216]).
The majority contends its limited-purpose test for commercial speech does not violate these principles because false or misleading commercial speech may be prohibited “entirely.” (Maj. opn., ante, at p. 953.) This logic is, however, faulty, because it erroneously assumes that false or misleading commercial speech as defined by the majority can never be speech about a *984 public issue. Under the majority’s test, the content of commercial speech is limited only to representations regarding “business operations, products, or services.” (Maj. opn., ante, at p. 961.) But business operations, products, or services may be public issues. For example, a corporation’s business operations may be the subject of public debate in the media. These operations may even be a political issue as organizations, such as state, local, or student governments, propose and pass resolutions condemning certain business practices. Under these circumstances, the corporation’s business operations undoubtedly become a matter of public concern, and speech about these operations merits the full protection of the First Amendment. (See Thornhill v. Alabama, supra, 310 U.S. at p. 102 [60 S.Ct. at p. 744].) Indeed, the United States Supreme Court has long recognized that speech on a public issue may be inseparable from speech promoting the speaker’s business operations, products or services. (See Thomas v. Collins, supra, 323 U.S. at pp. 535-536 [65 S.Ct. at p. 325] [recognizing that a union representative could not discuss the benefits of unionism without hawking the union’s services].)
The majority, however, creates an overbroad test that, taken to its logical conclusion, renders all corporate speech commercial speech. As defined, the test makes any public representation of fact by a speaker engaged in commerce about that speaker’s products made for the purpose of promoting that speaker’s products commercial speech. (See maj. opn., ante, at pp. 960-964.) A corporation’s product, however, includes the corporation itself. Corporations are regularly bought and sold, and corporations market not only their products and services but also themselves. Indeed, business goodwill is an important asset of every corporation and contributes significantly to the sale value of the corporation. Because all corporate speech about a public issue reflects on the corporate image and therefore affects the corporation’s business goodwill and sale value, the majority’s test makes all such speech commercial notwithstanding the majority’s assertions to the contrary. (See maj. opn., ante, at pp. 965-967.)
In so doing, the majority violates a basic principle of First Amendment law. (Consolidated Edison, supra, 447 U.S. at p. 535 [100 S.Ct. at p. 2332] [restrictions on the means by which a corporation “may participate in the public debate” “strike[] at the heart of the freedom to speak”].) By subjecting all corporate speech about business operations, products and services to the strict liability provisions of sections 17204 and 17535, the majority’s limited-purpose test unconstitutionally chills a corporation’s ability to participate in the debate over matters of public concern. (See Garrison v. Louisiana, supra, 379 U.S. at p. 74 [85 S.Ct. at pp. 215-216].) The chilling effect is exacerbated by the breadth of sections 17204 and 17535, which *985 “prohibit ‘not only advertising which is false, but also advertising which[,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public.'' ” (Maj. opn., ante, at p. 951, italics added, quoting Leoni v. State Bar (1985) 39 Cal.3d 609, 626 [217 Cal.Rptr. 423, 704 P.2d 183].) This broad definition of actionable speech puts a corporation “at the mercy of the varied understanding of [its] hearers and consequently of whatever inference may be drawn as to [its] intent and meaning.” (Thomas v. Collins, supra, 323 U.S. at p. 535 [65 S.Ct. at p. 325].) Because the corporation could never be sure whether its truthful statements may deceive or confuse the public and would likely incur significant burden and expense in litigating the issue, “[m]uch valuable information which a corporation might be able to provide would remain unpublished . . . .” (Bellotti, supra, 435 U.S. at p. 785, fn. 21 [98 S.Ct. at p. 1420].) As the United States Supreme Court has consistently held, such a result violates the First Amendment. (Ibid.)
Finally, in singling out speakers engaged in commerce and restricting their ability to participate in the public debate, the majority unconstitutionally favors certain speakers over others. Corporations “have the right to be free from government restrictions that abridge [their] own rights in order to ‘enhance the relative voice’ of [their] opponents.” (Pacific Gas & Electric, supra, 475 U.S. at p. 14 [106 S.Ct. at p. 910] (plur. opn. of Powell, J.), quoting Buckley v. Valeo (1976) 424 U.S. 1, 49 & fn. 55 [96 S.Ct. 612, 649, 46 L.Ed.2d 659].) The First Amendment does not permit favoritism toward certain speakers “based on the identity of the interests that [the speaker] may represent.” (Bellotti, supra, 435 U.S. at p. 784 [98 S.Ct. at p. 1420].) Indeed, “self-government suffers when those in power suppress competing views on public issues ‘from diverse and antagonistic sources.’ ” (Id. at p. 777, fn. 12 [98 S.Ct. at p. 1416], quoting Associated Press v. United States (1945) 326 U.S. 1, 20 [65 S.Ct. 1416, 1424, 89 L.Ed. 2013].) The majority, however, does just that. Under the majority’s test, only speakers engaged in commerce are strictly liable for their false or misleading representations pursuant to sections 17204 and 17535. Meanwhile, other speakers who make the same representations may face no such liability, regardless of the context of their statements. Neither United States Supreme Court precedent nor our precedent countenances such favoritism in doling out First Amendment rights.
in
The majority’s limited-purpose test is not only problematic in light of controlling high court precedent, the test appears to conflict with the analysis used by other courts in analogous contexts. These conflicts belie the majority’s claim of doctrinal consistency and underscore the illusory nature of its so-called solution to the commercial speech quandary.
*986 For example, the majority opinion conflicts with Gordon & Breach Science Publishers v. AIP (S.D.N.Y. 1994) 859 F.Supp. 1521 (Gordon & Breach). In Gordon & Breach, the defendant, a nonprofit publisher of scientific journals, published scientific articles touting its journals as “both less expensive and more scientifically important than those of for-profit publishers such as” the plaintiff. (Id. at p. 1525.) The defendant, as part of an advertising campaign designed to promote its journals, touted and defended the conclusions of these articles by, among other things, issuing press releases and writing letters to the editor responding to attacks on these articles. (Id. at pp. 1526-1527.) In light of these promotional activities, the plaintiff sued the defendant for false advertising under the Lanham Trademark Act (15 U.S.C. § 1125(a)) and New York law.
In determining whether the defendant’s advertising campaign constituted commercial speech, the district court identified the following dilemma: how to characterize “speech which, from one perspective, presents the aspect of protected, noncommercial speech addressing a significant public issue, but which, from another perspective, appears primarily to be speech ‘proposing a commercial transaction.’ ” (Gordon & Breach, supra, 859 F.Supp. at p. 1539.) After analyzing the relevant United States Supreme Court precedent, the court concluded that the articles, press releases and letters to the editor constituted noncommercial speech fully protected by the First Amendment. (See id. at pp. 1543-1544.)[2] According to the court, this speech fell “too close to core First Amendment values to be considered ‘commercial advertising or promotion’ under the Lanham Act.” (Id. at p. 1544.)
Application of the majority’s test would, however, result in a different outcome. The defendant was engaged in commerce; it sold journals. The intended audience was undoubtedly potential customers. The articles, press releases and letters contained representations of fact about the defendant’s products—its journals. Thus, they contain the three elements of commercial speech identified by the majority. The majority would therefore classify this speech as commercial speech even though it constitutes “fully protected commentary on an issue of public concern.” (Gordon & Breach, supra, 859 F.Supp. at p. 1544.)
Similarly, the majority’s test creates a conflict with Oxycal Laboratories, Inc. v. Jeffers (S.D.Cal. 1995) 909 F.Supp. 719. In Oxycal, the defendants published a book that denigrated the plaintiffs’ products while promoting the defendants’ products. The defendants allegedly promoted the book in an *987 effort to boost the sales of their own products. The plaintiffs sued, alleging false advertising. (See id. at pp. 720-721.) Finding this case easy, the court concluded that the book was noncommercial speech because there were “sufficient noncommercial motivations” notwithstanding the commercial motivations. (Id. at pp. 724-725.) To the extent the book contained commercial elements promoting the defendants’ products, these commercial elements were “intertwined” with and secondary to the noncommercial elements. (Id. at p. 725.)
Once again, the majority’s test would yield a contrary result. The defendants were engaged in commerce, and the intended audience for the book was potential consumers. The book contained representations of fact about the defendants’ products, and the defendants undoubtedly made these representations for the purpose of promoting their products. Thus, under the majority’s test, the book was commercial speech, and the defendants would have been strictly liable for any false or misleading statements about their products in the book.
Although we are not bound by these decisions, they are instructive and highlight the deficiencies in the majority’s limited-purpose test for commercial speech. In divining a new test for commercial speech, the majority finds a deceptively simple answer to a complicated question. Unfortunately, the answer is flawed. By failing to recognize that a speaker’s business operations, products, or services may be matters of public concern, the majority ignores controlling principles of First Amendment law. As a result, the majority erroneously draws a bright line when “a broader and more nuanced inquiry” is required. (Gordon & Breach, supra, 859 F.Supp. at p. 1537; see also id. at p. 1540, fn. 7.)
IV
Of course, my rejection of the majority’s limited-purpose test does not resolve the central issue in this case: What level of protection should be accorded to Nike’s speech under the First Amendment? To answer this question, this court, as the majority correctly notes, must determine whether Nike’s speech is commercial or noncommercial speech. Following the existing framework set up by the United States Supreme Court, I would conclude that Nike’s speech is more like noncommercial speech than commercial speech because its commercial elements are inextricably intertwined with its noncommercial elements. Thus, I would give Nike’s speech the full protection of the First Amendment.
When determining whether speech is commercial or noncommercial, courts must “ensure that speech deserving of greater constitutional protection is not inadvertently suppressed.” (Bolger, supra, 463 U.S. at p. 66 [103 *988 S.Ct. at p. 2880].) In following this philosophy in cases involving hybrid speech containing both commercial and noncommercial elements, the United States Supreme Court has assessed the separability of these elements to determine the proper level of protection. If the commercial elements are separable from the noncommercial elements, then the speech is commercial and receives lesser protection. Thus, advertising that merely “links a product to a current public debate” is still commercial speech notwithstanding its noncommercial elements. (Central Hudson, supra, 447 U.S. at p. 563, fn. 5 [100 S.Ct. at p. 2349].) Where the speaker may comment on a public issue without promoting its products or services, the speech is also commercial, even if the speaker combines a commercial message with a noncommercial message. (See Board of Trustees, State Univ. of N. Y. v. Fox (1989) 492 U.S. 469, 474 [109 S.Ct. 3028, 3031, 106 L.Ed.2d 388] (Fox) [speaker did not have to combine its sales pitch for Tupperware with its home economics lessons].) Indeed, “[advertisers should not be permitted to immunize false or misleading product information from government regulation simply by including references to public issues.” (Bolger, at p. 68 [103 S.Ct. at p. 2881].)
The United States Supreme Court has, however, recognized that commercial speech may be “inextricably intertwined” with noncommercial speech in certain contexts. (Riley, supra, 487 U.S. at p. 796 [108 S.Ct. at p. 2677].) Where regulation of the commercial component of certain speech would stifle otherwise protected speech, “we cannot parcel out the speech, applying one test to one phrase and another test to another phrase. Such an endeavor would be both artificial and impractical.” (Ibid.) In such cases, courts must apply, the “test for fully protected expression” rather than the test for commercial speech.[3] (Riley, at p. 796 [108 S.Ct. at p. 2677].)
Although the United States Supreme Court has mostly found this intertwining of commercial and noncommercial speech in the charitable solicitation context,[4] it has also done so in a factual context analogous to the one *989 presented here. In Thomas v. Collins, supra, 323 U.S. 516,[5] the United States Supreme Court held that a speech made by a union representative promoting the union’s services and inviting workers to join constituted noncommercial speech fully protected by the First Amendment. (Thomas, at pp. 536-537 [65 S.Ct. at pp. 325-326].) Although the court acknowledged that the speech promoted the services of the union and sought to solicit new members, it found that these commercial elements were inextricably intertwined with the noncommercial elements addressing a public issue—unionism. (See id. at pp. 535-536 [65 S.Ct. at p. 325].) “The feat would be incredible for a national leader, addressing such a meeting, lauding unions and their principles, urging adherence to union philosophy, not also and thereby to suggest attachment to the union by becoming a member.” (Id. at p. 535 [65 S.Ct. at p. 325].) Indeed, “whether words intended and designed to fall short of invitation would miss that mark is a question both of intent and of effect. No speaker, in such circumstances, safely could assume that anything he might say upon the general subject would not be understood by some as an invitation.” (Ibid.)
Finding that the commercial elements of the union representative’s speech should be accorded the full protection of the First Amendment, the court concluded that distinguishing between the speech’s commercial and noncommercial elements “offers no security for free discussion.” (Thomas v. Collins, supra, 323 U.S. at p. 535 [65 S.Ct. at p. 325].) “In these conditions,” making such a distinction “blankets with uncertainty whatever may be said. It compels the speaker to hedge and trim.” (Ibid.) “When legislation or its application can confine labor leaders on such occasions to innocuous and abstract discussion of the virtues of trade unions and so becloud even this with doubt, uncertainty and the risk of penalty, freedom of speech for them will be at an end. A restriction so destructive of the right of public discussion ... is incompatible with the freedoms secured by the First Amendment.” (Id. at pp. 536-537 [65 S.Ct. at p. 325].)
*990 This case presents a similar scenario because Nike’s overseas labor practices have become a public issue. According to the complaint, Nike faced a sophisticated media campaign attacking its overseas labor practices. As a result, its labor practices were discussed on television news programs and in numerous newspapers and magazines. These discussions have even entered the political arena as various governments, government officials and organizations have proposed and passed resolutions condemning Nike’s labor practices.[6] Given these facts, Nike’s overseas labor practices were undoubtedly a matter of public concern, and its speech on this issue was therefore “entitled to special protection.” (Connick v. Myers, supra, 461 U.S. at p. 145 [103 S.Ct. at p. 1689].) Because Nike could not comment on this public issue without discussing its overseas labor practices, the commercial elements of Nike’s representations about its labor practices were inextricably intertwined with their noncommercial elements. (See Riley, supra, 487 U.S. at p. 796 [108 S.Ct. at p. 2677].) As such, these representations must be fully protected as noncommercial speech in the factual context presented here. (See Thomas v. Collins, supra, 323 U.S. at pp. 535-536 [65 S.Ct. at p. 325].)
The majority’s assertion that Nike’s representations about its overseas labor practices are distinct from its comments on “policy questions” is •simply wrong. (Maj. opn., ante, at p. 966.) The majority contends Nike can still comment on the policy issues implicated by its press releases and letters because it can generally discuss “the degree to which domestic companies should be responsible for working conditions in factories located in other countries, or what standards domestic companies ought to observe in such factories, or the merits and effects of economic ‘globalization’ generally . . . .” (Ibid.) The majority, however, conveniently forgets that Nike’s overseas labor practices are the public issue. (See ante, at p. 990.) Thus, *991 general statements about overseas labor exploitation and economic globalization do not provide Nike with a meaningful way to participate in the public debate over its overseas labor practices. (See Thomas v. Collins, supra, 323 U.S. at pp. 536-537 [65 S.Ct. at pp. 325-326].)
Even if the majority correctly characterizes the public issues implicated by Nike’s press releases and letters, its assertion is still wrong. In light of the sophisticated media campaign directed at Nike’s overseas labor practices and the close association between Nike’s labor practices and the public debate over overseas labor exploitation and economic globalization, Nike could not comment on these public issues without discussing its own labor practices. Indeed, Nike could hardly condemn exploitation of overseas workers and discuss the virtues of economic globalization without implying that it helps overseas workers and does not exploit them. By limiting Nike to “innocuous and abstract discussion,” the majority has effectively destroyed Nike’s “right of public discussion.” (Thomas v. Collins, supra, 323 U.S. at pp. 536-537 [65 S.Ct. at pp. 325-326].) Under these circumstances, Nike no longer “has the full panoply of protections available to its direct comments on public issues . . . .” (Bolger, supra, 463 U.S. at p. 68 [103 S.Ct. at p. 2881], fn. omitted.) Accordingly, the factual representations in Nike’s press releases and letters are fully protected under current First Amendment jurisprudence. (See Thomas v. Collins, at pp. 536-537 [65 S.Ct. at pp. 325-326]; Gordon & Breach, supra, 859 F.Supp. at p. 1544.)
Such a conclusion is consistent with the commercial speech decisions of the United States Supreme Court. Most of these decisions involve core commercial speech that does “no more than propose a commercial transaction.”[7] (Pittsburgh Press, supra, 413 U.S. at p. 385 [93 S.Ct. at p. 2558].) Because speech that just proposes a commercial transaction, by definition, *992 only promotes the sale of a product or service and does not address a public issue, these decisions are inapposite.
The United States Supreme Court decisions finding hybrid speech containing both commercial and noncommercial elements to be commercial are also distinguishable. In these cases, the court found that the commercial elements of the speech were separable from its noncommercial elements and were therefore unnecessary for conveying the noncommercial message. (See Fox, supra, 492 U.S. at p. 474 [109 S.Ct. at p. 3031] [sales pitch for Tupperware was not an indispensable part of the noncommercial speech about home economics]; Zauderer v. Office of Disciplinary Counsel (1985) 471 U.S. 626, 637, fn. 7 [105 S.Ct. 2265, 2274-2275, 85 L.Ed.2d 652] [client solicitations were separable from noncommercial statements describing legal rights].) Because the commercial message was merely linked to—and not inextricably intertwined with—the noncommercial message, the court concluded that restrictions on the commercial message would not stifle the speaker’s ability to engage in protected speech. As explained above, this case is different. Nike’s overseas business operations have become the public issue, and Nike cannot comment on important public issues like overseas worker exploitation and economic globalization without implicating its own labor practices. (See ante, at pp. 990-992.) Thus, the commercial elements of Nike’s press releases, letters, and other documents were inextricably intertwined with their noncommercial elements, and they must be fully protected as noncommercial speech. (See Riley, supra, 487 U.S. at p. 796 [108 S.Ct. at p. 2677]; Thomas v. Collins, supra, 323 U.S. atpp. 536-537 [65 S.Ct. at pp. 325-326]; Gordon & Breach, supra, 859 F.Supp. at p. 1544.)
Finally, Bolger, the primary case relied on by the majority, is distinguishable. In Bolger, a contraceptive manufacturer wished to mail, among other things, informational pamphlets that discussed the problem of venereal disease and the benefits of condoms and referenced the manufacturer. The United States Postal Service banned the mailings, and the manufacturer challenged the constitutionality of the ban. (See Bolger, supra, 463 U.S. at pp. 62-63 [103 S.Ct. at pp. 2877-2878].) In assessing the constitutionality of the ban, the United States Supreme Court concluded that the informational *993 pamphlets constituted commercial speech “notwithstanding the fact that they contain discussions of important public issues.” (Id. at pp. 67-68 [103 S.Ct. at pp. 2880-2881], fn. omitted.) Unlike Nike’s overseas business operations, however, the products at issue in Bolger had not become a public issue. Moreover, in the factual context of Bolger, the manufacturer could have commented on the issues of venereal disease and family planning through avenues other than promotional mailings and without referencing its own products. By contrast, Nike has no other avenue for defending its labor practices, given the breadth of sections 17204 and 17535 (see maj. opn., ante, at pp. 950-951), and Nike cannot comment on the issues of labor exploitation and economic globalization without referencing its own labor practices (see ante, at pp. 990-992). Given these differences, Bolger does not compel the majority’s conclusion.
Constrained by the United States Supreme Court’s current formulation of the commercial speech doctrine, I would therefore conclude that Nike’s press releases, letters, and other documents defending its overseas labor practices are noncommercial speech. Based on this conclusion, I would find the application of sections 17204 and 17535 to Nike’s speech unconstitutional. Accordingly, I would affirm the judgment of the Court of Appeal.
V
The majority attempts to refute the application of the inextricably intertwining doctrine by factually distinguishing Thomas and Thornhill. The majority’s proposed distinction, however, exposes a major flaw in its analysis. According to the majority, Thomas and Thornhill do not control because they neither address “the validity of a law prohibiting false or misleading speech” (maj. opn., ante, at p. 965) nor bar states from prohibiting “false and misleading factual representations, made for purposes of maintaining and increasing sales and profits, about the speaker’s own products, services, or business operations” (ibid.). The majority apparently finds this distinction persuasive because it previously concluded that Nike’s speech is only “commercial speech for purposes of applying state laws designed to prevent false advertising and other forms of commercial deception.” (Id. at p. 964.)
Although the logic is difficult to follow, the majority apparently characterizes corporate speech as commercial or noncommercial based on whether the speech is false or misleading. Such an outcome, however, betrays a fundamental misunderstanding of the issue presented in this case. As the majority acknowledges, state laws may only prohibit false or misleading speech if that speech is commercial. Thus, the critical question is whether the speech at issue is commercial or noncommercial speech. Whether the statutes at issue are “designed to prevent false advertising and other forms of *994 commercial deception” has no bearing on this question. (Maj. opn., ante, at p. 964.) The majority’s assertion that Nike’s statements are commercial speech because the application of false advertising laws is at issue therefore makes no sense. (See ibid.) Indeed, the majority begs the question by making false or misleading corporate speech commercial speech because it is false or misleading.
VI
In today’s world, the difference between commercial and noncommercial speech is not black and white. Due to the growing politicization of commercial matters and the increased sophistication of advertising campaigns, the intersection between commercial and noncommercial speech has become larger and larger. As this gray area expands, continued adherence to the dichotomous, all-or-nothing approach developed by the United States Supreme Court will eventually lead us down one of two unappealing paths: either the voices of businesses in the public debate will be effectively silenced, or businesses will be able to dupe consumers with impunity.
Rather than continue down this path, I believe the high court must reassess the commercial speech doctrine and develop a more nuanced inquiry that accounts for the realities of today’s commercial world. Without abandoning the categories of commercial and noncommercial speech, the court could develop an approach better suited to today’s world by recognizing that not all speech containing commercial elements should be equal in the eyes of the First Amendment.
For example, the United States Supreme Court could develop an intermediate category of protected speech where commercial and noncommercial elements are closely intertwined. In light of the conflicting constitutional principles at play, this intermediate category could receive greater protection than commercial speech but less protection than noncommercial speech. Under such an approach, false or misleading speech that falls within the intermediate category could be actionable so long as states do not impose liability without fault. (Cf. Gertz, supra, 418 U.S. at p. 347 [94 S.Ct. at p. 3010] [“so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual”].)
Alternatively, the court could abandon its blanket rule permitting the proscription of all false or misleading commercial speech. Instead, the court could devise a test for determining whether governmental restrictions on false or misleading speech with commercial elements survive constitutional scrutiny. In doing so, the court could develop a more nuanced approach that *995 maximizes the ability of businesses to participate in the public debate without allowing consumer fraud to run rampant.
Even if these suggestions are unworkable or problematic, the practical realities of today’s commercial world require a new “ ‘accommodation between [First Amendment] concem[s] and the limited state interest present in the context of’ ” strict liability actions targeting speech with inextricably intertwined commercial and noncommercial elements. (Dun & Bradstreet, supra, 472 U.S. at p. 756 [105 S.Ct. at p. 2944] (plur. opn. of Powell, J.), quoting Gertz, supra, 418 U.S. at p. 343 [94 S.Ct. at p. 3008].) The high court long ago recognized that “[t]he diverse motives, means, and messages of advertising may make speech ‘commercial’ in widely varying degrees.” (Bigelow v. Virginia, supra, 421 U.S. at p. 826 [95 S.Ct. at p. 2235].) Given the growing intersection between advertising and noncommercial speech, such as political, literary, scientific and artistic expression, this observation is equally cogent where the commercial speech is false or misleading.
I realize the task is not easy. Indeed, Justice Scalia has recently alluded to the intractability of the problem. (See 44 Liquormart v. Rhode Island, supra, 517 U.S. 484, 518 [116 S.Ct. at p. 1515] (conc. opn. of Scalia, J.) [“I do not believe we have before us the wherewithal to declare Central Hudson wrong—or at least the wherewithal to say what ought to replace it”].) Nonetheless, a new accommodation of the relevant constitutional concerns is possible, and the United States Supreme Court can and should devise a more nuanced approach that guarantees the ability of speakers engaged in commerce to participate in the public debate without giving these speakers free rein to lie and cheat.
For example, such an accommodation could permit states to bar all false or misleading representations about the characteristics of a product or service—i.e., the efficacy, quality, value, or safety of the product or service— without justification even if these characteristics have become a public issue. In such a situation, the governmental interest in protecting consumers from fraud is especially strong because these representations address the fundamental questions asked by every consumer when he or she makes a buying decision: does the product or service work well and reliably, is the product or service harmful and is the product or service worth the cost? Moreover, these representations are the traditional target of false advertising laws. Thus, the strong governmental interest in this context trumps any First Amendment concerns presented by a blanket prohibition on such false or misleading representations.
By contrast, the governmental interest in protecting against consumer fraud is less strong if the representations are unrelated to the characteristics *996 of the product or service. In some situations involving these representations, the First Amendment concerns may trump this governmental interest. A blanket prohibition of false or misleading representations in such a situation would be unconstitutional because the prohibition may stifle the ability of businesses to comment on public issues. Indeed, this case offers a prime example. Making Nike strictly hable for any false or misleading representations about its labor practices stifles Nike’s ability to participate in a public debate initiated by others. Accommodating the competing interests in this context precludes the blanket prohibition favored by the majority. Although strict liability is inappropriate, an actual malice standard may be too high because these representations undoubtedly influence some consumers in their buying decisions, and the government has a strong interest in minimizing consumer deception. Thus, a well-crafted test could give states the flexibility to define the standard of liability for false or misleading misrepresentations in this context so long as the standard is not strict liability.[8] (Cf. Gertz, supra, 418 U.S. at p. 347 [94 S.Ct. at pp. 3010-3011].)
VII
The majority accuses me of searching for my own “magic formula or incantation” because I urge a reevaluation of the commercial speech doctrine. (Maj. opn, ante, at p. 969.) To this charge, I plead guilty. Unlike the majority, which finds nothing unsettling about doctrinal incoherence, I readily acknowledge that some wizardry may be necessary if courts are to adapt the commercial speech doctrine to the realities of today’s commercial world. Unfortunately, Merlin and Gandalf are busy, so the United States Supreme Court will have to fill the gap.
Although I make these magical references in jest, my point is serious: the commercial speech doctrine needs and deserves reconsideration and this is as good a place as any to begin. I urge the high court to do so here.
Respondents’ petition for a rehearing was denied July 31, 2002, and on May 22, 2002, the opinion was modified to read as printed above. Brown, J., did not participate therein. Baxter, J., and Chin, J., were of the opinion that the petition should be granted.

All further statutory references are to the Business and Professions Code.

The court did find that the defendant’s distribution of preprints of the articles to potential customers and its repeated dissemination of the conclusions of these articles to potential customers constituted commercial speech. (Gordon & Breach, supra, 859 F.Supp. at p. 1544.)

The majority’s attempts to distinguish Riley are not persuasive. First, “charitable solicitations” do “involve factual representations about a product or service that is offered for sale” (maj. opn., ante, at pp. 966-967), where, as in Riley, the charitable solicitations are made by professional fundraisers who solicit contributions for a fee (see Riley, supra, 487 U.S. at pp. 784-785 [108 S.Ct. at pp. 2671-2672]). Second, Fox does not preclude the application of Riley in this case. (See maj. opn., ante, at pp. 966-967.) It is “impossible for Nike to address” certain public issues without addressing its own labor practices (maj. opn., ante, at p. 967), because these practices are the public issue and symbolize the current debate over overseas labor exploitation and economic globalization (see, post, at pp. 990-992).

(See, e.g., Riley, supra, 487 U.S. at p. 796 [108 S.Ct. at p. 2677]; Secretary of State of Md. v. J. H. Munson Co. (1984) 467 U.S. 947, 959-960 [104 S.Ct. 2839, 2848-2849, 81 L.Ed.2d 786]; Village of Schaumburg v. Citizens for Better Environ. (1980) 444 U.S. 620, 632 [100 *989 S.Ct. 826, 833-834, 63 L.Ed.2d 73]; see also Meyer v. Grant (1988) 486 U.S. 414, 422, fn. 5 [108 S.Ct. 1886, 1892, 100 L.Ed.2d 425] [finding the solicitation of signatures for a petition to be noncommercial speech].)

The majority contends Thomas and Thornhill are not relevant because “[t]he United States Supreme Court issued these decisions three decades before it developed the modem commercial speech doctrine in Bigelow v. Virginia [(1975)] 421 U.S. 809 [95 S.Ct. 2222, 44 L.Ed.2d 600], and Va. [Consumer Council], supra, 425 U.S. 748.” (Maj. opn., ante, at p. 965.) The majority, however, conveniently neglects to mention that both Bigelow and Va. Consumer Council cite Thomas and Thornhill with approval. (See Va. Consumer Council, supra, 425 U.S. at pp. 758-759 [96 S.Ct. at p. 1824] [citing Thomas as a case where the court “has stressed that communications to which First Amendment protection was given were not ‘purely commercial’ ”]; id. at pp. 757, 762 [96 S.Ct. at pp. 1823, 1825-1826]; Bigelow, supra, 421 U.S. at p. 816 [95 S.Ct. at pp. 2229-2230].) Thus, the United States Supreme Court, in developing the commercial speech doctrine, did not intend to overrule or diminish the relevance of Thomas and Thornhill. In any event, the binding effect of a high court opinion does not diminish with age.

(See, e.g., Cleeland, Market Savvy Students Give Sweatshop Fight the College Try, L.A. Times (Apr. 22, 1999) p. C1 [“a half-dozen universities have adopted stringent codes of conduct for manufacturers of apparel that bear their logos; many more are reexamining their policies”]; Martinez, Student Protests Unlikely to Kill UA-Nike Deal, Ariz. Daily Star (Jan. 25, 1998) p. 1B [“Hundreds of UA students have signed a petition protesting the university’s impending contract with Nike because of alleged human rights abuses in the company’s factories overseas”]; Stepping Up Nike Criticism, Newsday (Nov. 10, 1997) p. A22 [“More than 50 lawmakers yesterday called on Nike Inc. to improve labor standards in Third World factories and to employ more people in the United States”]; Stancill, Students to Keep Pressure on Nike, Raleigh News & Observer (Nov. 8, 1997) p. B1 [students signing and circulating petitions against Nike]; Jeffcott, Consumer Power Takes on Brand Names, Big Retailers (Sept. 7, 1997) 21 Catholic New Times 14, 15 [as part of the global movement to end sweatshops, various groups are pressuring “city councils to adopt ‘no sweat resolutions’ ” directed at multinational companies like Nike]; Himelstein, Going Beyond City Limits?, Business Week (July 7, 1997) p. 98 [at least 10 cities have passed no-sweatshop ordinances directed at multinational companies like Nike]; Klein, Just Doing It Lands Nike in Ethical Hot Water, Toronto Star (Feb. 24, 1997) p. A19 [city council passes resolution banning the use of child-made Nike soccer balls].)

(See, e.g., Lorillard Tobacco Co. v. Reilly (2001) 533 U.S. 525, 536 [121 S.Ct. 2404, 2411-2412, 150 L.Ed.2d 532] [oral, written, graphic, or pictorial advertisements for smokeless tobacco and cigars]; Greater New Orleans Broadcasting, supra, 527 U.S. at p. 176 [119 S.Ct. at pp. 1926-1927] [radio broadcasts of promotional ads for casino gambling]; 44 Liquormart, Inc. v. Rhode Island, supra, 517 U.S. at pp. 492-493 [116 S.Ct. at pp. 1502-1503] (plur. opn. of Steven, J.) [ads referencing the price of alcohol products]; Rubin v. Coors Brewing Co. (1995) 514 U.S. 476, 481 [115 S.Ct. 1585, 1589, 131 L.Ed.2d 532] [parties conceded that labels on alcohol products listing alcohol content was commercial speech]; Ibanez v. Florida Dept. of Business and Professional Regulation, Bd. of Accountancy (1994) 512 U.S. 136, 138 [114 S.Ct. 2084, 2086, 129 L.Ed.2d 118] [ads and promotional communications listing professional affiliations of attorney]; United States v. Edge Broadcasting Co. (1993) 509 U.S. 418, 421 [113 S.Ct. 2696, 2700-2701, 125 L.Ed.2d 345] [radio broadcasts advertising lotteries]; Edenfield v. Fane, supra, 507 U.S. at pp. 763-764 [113 S.Ct. at pp. 1796-1797] [in-person solicitations for business by certified public accountants]; Discovery Network, supra, 507 U.S. at pp. 416, 424 [113 S.Ct. at pp. 1509-1510, 1514] [parties conceded that magazines were commercial speech]; Posadas de Puerto Rico Assoc, v. Tourism Co. (1986) 478 U.S. 328, 330 [106 S.Ct. 2968, 2971, 92 L.Ed.2d 266] [casino ads]; In re *992 R.M.J. (1982) 455 U.S. 191, 196-197 [102 S.Ct. 929, 934, 71 L.Ed.2d 64] [print ads and professional announcement cards]; Central Hudson, supra, 447 U.S. at p. 562, fn. 5 [100 S.Ct. at pp. 2349-2350] [ads “clearly intended to promote sales”]; Friedman v. Rogers (1979) 440 U.S. 1, 11 [99 S.Ct. 887, 895, 59 L.Ed.2d 100] [trade name]; Ohralik, supra, 436 U.S. at p. 454 [98 S.Ct. at pp. 1917-1918] [in-person solicitation of business by lawyer]; Bates, supra, 433 U.S. at p. 354 [97 S.Ct. at p. 2699] [ads containing pricing information]; Va. Consumer Council, supra, 425 U.S. at pp. 760-761 [96 S.Ct. at pp. 1824-1825] [ads containing drug prices]; Pittsburgh Press Co. v. Human Relations Comm’n (1973) 413 U.S. 376, 379 [93 S.Ct. 2553, 2555-2556, 37 L.Ed.2d 669] (Pittsburgh Press) [job ads].)

States may, however, adopt a strict liability standard for false and misleading representations unrelated to the characteristics of a product or service where the representations are not inextricably tied to a public issue.